J-S33031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Q.S.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1955 EDA 2022 |

Appeal from the Order Entered July 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000757-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: P.S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Q.S.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1956 EDA 2022 |

Appeal from the Decree Entered July 6, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000003-2022

BEFORE:  KUNSELMAN, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED DECEMBER 12, 2022**

Q.S.W. ("Mother") appeals from the decree involuntarily terminating her parental rights to her daughter, P.W. a/k/a P.S.W. ("Child"), born in February 2020[1]  and the order changing Child's permanency goal from reunification to

---

[1] By separate decrees entered on the same date, the trial court involuntarily terminated the parental rights of D.G. ("Father"), and any unknown father to Child.  Neither Father nor any unknown father has appealed from the respective decree or the goal change order.

adoption. We affirm the termination decree and dismiss the appeal from the goal change order as moot.

We summarize the relevant facts and procedural history from the record. The Philadelphia Department of Human Services ("DHS") first became aware of Mother in May of 2020, when DHS received a report alleging that she "tried to murder [C]hild by putting a plastic bag over" Child's head. N.T., 4/13/22, at 12, 60. Mother admitted to allegations that she was under the influence of a controlled substance at the time, and she has been diagnosed with hallucinations disorder, moderate schizophrenia, bipolar I disorder, major depressive disorder, and generalized anxiety disorder. *See id.* at 40, 60; *see also* N.T., 7/6/22, at 48, 68. DHS did not take custody of Child but placed Child on a safety plan with her maternal grandmother. *See* N.T., 4/13/22, at 61. In June 2020, Child's maternal grandmother died, and other maternal relatives cared for Child. *See id.*; *see also* N.T., 7/6/22, at 48.

In July 2020, Mother and Child entered an inpatient mother/baby program at Interim House ("Interim House"), which provides dual diagnosis treatment for women with their children.[2] *See* N.T., 4/13/22, at 12, 61; *see also* N.T., 7/6/22, at 55; DHS Exhibit 4. The court adjudicated Child dependent but granted Mother legal and physical custody of Child, conditioned

---

[2] As best we can discern, Mother voluntarily entered the inpatient program at Interim House. *See* N.T., 4/13/22, at 13; *see also* N.T., 7/6/22, at 73. The record indicates that DHS had filed a petition to adjudicate Child dependent on July 9, 2020, around the time Mother and Child went to Interim House.

on Mother remaining in the mother/baby program. ***See*** DHS Exhibit 1, at 21. Mother's single case plan ("SCP") objectives included engaging in mental health and drug and alcohol treatment, obtaining adequate housing, and visiting Child. ***See*** N.T., 4/13/22, at 12, 14-15. Mother and Child remained at Interim House until October 28, 2020, when Mother physically assaulted another program resident. ***See*** N.T., 4/13/22, at 13. Due to the incident, Mother was arrested and removed from the program. ***See id***.; ***see also*** N.T., 7/6/22, at 72-73.

On October 28, 2020, DHS obtained an order for protective custody of Child and placed Child in a foster home, where Child has remained. ***See*** N.T., 4/13/22, at 13. The court then held a shelter care hearing and fully committed Child to DHS's care. ***See*** DHS Exhibit 1, at 23. The court ordered visitations at the agency for Mother. ***See id***.

Mother attended supervised visits with Child on a weekly basis for two hours.[3] N.T., 4/13/22, at 16. In late October 2021, Mother abruptly ended a visit, stating that she was not feeling well. ***See id***. at 18. Approximately two weeks after that visit, Mother set herself on fire and was subsequently admitted to the Jefferson Hospital Burn Unit. ***See id***. at 17-18. Mother was discharged from the Burn Unit in late November, and her visits with Child resumed in early December 2021, but she missed several visits. ***See id***. at 19, 12-22, 36; DHS Exhibit 6.

---

[3] It appears that Mother was released from prison after her arrest in October 2020. ***See*** N.T. 4/13/22, at 16.

On January 4, 2022, DHS filed a petition for the involuntary termination of Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). That same day, DHS filed a petition to change Child's permanency goal to adoption.

Mother subsequently enrolled in Pathways to Recovery ("Pathways"), a partial hospitalization program that provides drug and alcohol treatment and mental health services. **See** N.T., 4/13/22, at 37; DHS Exhibit 7. A Pathways therapist recommended that, upon discharge from the program, Mother should attend intensive outpatient therapy and community meetings "for strengthening of learned coping skills beneficial to recovery maintenance." DHS Exhibit 7.

Hearings on DHS's petitions occurred on April 13, 2022, and July 6, 2022.[4] At the April 13th hearing, Edward McNichol ("Mr. McNichol"), the family's Community Umbrella Agency ("CUA") case worker since 2021,

---

[4] Gary Server, Esquire, represented Child as guardian *ad litem* ("GAL"), but the trial court did not appoint counsel to represent Child's legal interests. We note that Child was less than two years old when DHS filed the petition for the involuntary termination of Mother's parental rights, and less than two and a half years old by the time of second termination hearing. **See In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of [s]ection 2313(a)" is satisfied).

testified that Mother's progress toward alleviating the circumstances of Child's removal from her care was "minimal." N.T., 4/13/22, at 43.[5]

By the time of the second hearing on July 6, 2022, at which Mother testified, Mother had completed the Pathways program. *See* N.T., 7/6/22, at 36, 39; Mother's Exhibit 6. Mother also began attending outpatient recovery treatment at Gaudenzia. *See* N.T., 7/6/22, at 31; Mother's Exhibit 5. At the conclusion of the July 6, 2022 hearing, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) and changed Child's permanency goal to adoption. Mother timely appealed the trial court's involuntary termination decree and the goal change order and contemporaneously filed concise statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i), (b). In lieu of Rule 1925(a) opinions, the trial court filed statements that its reasoning for terminating Mother's parental rights and changing the goal to adoption appeared at the conclusion of the hearing. This Court consolidated Mother's appeals *sua sponte*.

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[ ] pursuant to [23 Pa.C.S.A. § 2511(a)(1)] where Mother presented evidence that she tried to perform her parental duties.

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[ ] pursuant to [23 Pa.C.S.A. § 2511(a)(2)] where Mother presented evidence

---

[5] Additionally, Mr. McNichol testified that Mother recognized that her residence at the time was not appropriate for Child. *See* N.T., 4/13/22, at 26.

that she has remedied her situation by taking parenting classes and anger management classes and receiving treatment for her mental health and drug addiction and now has the present capacity to care for her [C]hild.

3.    Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[ ] pursuant to [23 Pa.C.S.A. § 2511(a)(5)] where evidence was provided to establish that the [C]hild was removed from the care of the Mother and Mother is now capable of caring for her [C]hild.

4.    Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[ ] pursuant to [23 Pa.C.S.A. § 2511(a)(8)] where evidence was presented to show that Mother is now capable of caring for her [C]hild after she completed parenting classes, completed anger management and is in treatment for mental health and drug addiction.

5.    Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother[ ] pursuant to [23 Pa.C.S.A. § 2511(b)] where evidence was presented that established the [C]hild had lived with her Mother for the [sic] part of her life.  Additionally, Mother maintained that bond by visiting with her.

Mother's Brief at 7.

We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).  In applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021); *see also In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. **See** 23 Pa.C.S.A. § 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). **See id**. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is also satisfied. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In this instant case, the trial court terminated Mother's parental rights under sections 2511(a)(1), (2), (5), (8), and (b). As we need only agree with the trial court's determination as to any one of the grounds for termination under subsection (a), we limit our discussion to subsections (a)(8) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy section 2511(a)(8), the petitioner must show three components: (1) the child has been removed from the care of the parent for at least twelve months; (2) the conditions which led to the removal or placement of the child still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).[6] Although we have recognized that the application of section 2511(a)(8) may seem harsh when a parent has begun efforts to resolve the problems that had led to the removal of her child, we are cognizant that the statute implicitly recognizes "that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not

---

[6] Both section 2511(a)(8) and section 2511(b) require consideration of the needs and welfare of a child. Section 2511(a)(8), however, requires an evaluation of the conduct of a parent, while section 2511(b) focuses on the child. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*). Therefore, the needs and welfare examination under section 2511(a)(8) is a distinct element and must be considered before section 2511(b). *See id*. at 1009.

subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Mother asserts that she "completed parenting, anger management, and financial management," "has worked to complete her SCP goals," and "is in mental health and drug treatment programs." Mother's Brief at 17. Mother contends that she "has the current capacity to care for" Child and is ready to have Child with her in a mother/baby treatment setting. *See id*.

The trial court, in granting DHS's petition for the involuntary termination of Mother's parental rights, credited and commended Mother's progress after the filing of DHS's petition and between the hearings.[7] Nevertheless, the court determined that: more than twelve months had passed since the removal of Child from Mother's care; the conditions that led to Child's removal continued to exist and that there were no indications that Mother would "imminently be able to" care for Child; and it was "in the best interest of . . . [C]hild to have permanency." N.T., 7/6/22, at 90-94.

Following our review, we conclude that the record supports the trial court's determinations. As to the first element of section 2511(a)(8), there is

---

[7] The trial court noted a gap in Mother's efforts in seeking mental health and drug and alcohol treatment immediately before DHS filed the petition for the involuntary termination of her parental rights, but elected to consider Mother's post-petition efforts to treat her mental health and drug and alcohol issues, at least in the alternative. *See* N.T., 7/6/22, at 89-90.

no dispute that Child had been removed from Mother's care for more than twenty-one months before the filing of the involuntary termination of Mother's parental rights. Thus, DHS met the requirement of showing that the removal of the child from the care of his parents for more than twelve months.

As to the second element of section 2511(a)(8), which requires proof that the conditions that led to the child's removal still exist, Mr. McNichol testified that as of the first hearing on April 13, 2022, Mother had not successfully completed a complete drug and alcohol treatment program. *See* N.T., 4/13/22, at 36. Mr. McNichol noted that "Mother ha[d] sporadically attended the Interim House program, left them[,] and [had] gone to other program," and he stated that Mother's lack of consistency in treatment triggered "red flags."[8] *Id*. at 34, 88-89. He reported that Mother's attendance and participation at Pathways, where she was receiving treatment at the time of the first hearing, was erratic. *See id*. at 90. He expressed further concerns about returning Child to Mother in an unsecured treatment setting, because Mother could leave the facility and there would be "no safety net to protect" Child. *Id*. at 90. Mr. McNichol further noted that in September 2021, Mother had relapsed on phencyclidine ("PCP") and admitted herself to Fairmount Hospital. *See id*. at 36, 77.

---

[8] Mr. McNichol testified that Mother gave various reasons for not finishing any treatment program including not getting along with other program residents and Mother's belief that the programs were not properly serving her. *See* N.T., 4/13/22, at 37.

As noted by the trial court, Mother's own testimony at the July 6, 2022, hearing also contradicted her assertion she was ready to reunify with Child. Mother testified that she set herself on fire in the early morning hours of October 31, 2021, and did not seek treatment until later that evening. *See* N.T., 7/6/22, at 49, 64. Mother explained that she set herself on fire because of "depression," she had stopped taking her medication for three days, and she had been unaware that her mental health issues were "so severe." *Id*. at 49, 64.

When asked how she would manage her mental health issues while caring for Child if she were to reunify with Child, Mother testified:

> Well, it would be a little different because, if I had an episode, it's always things that happens first, whether I see -- whether I see things or feel things, it's always something to let [me] know that something is about to happen, for me to, you know, inform somebody.
>
> But that was another reason -- I didn't want housing, and I want to go into a mother-baby program because I don't -- I just don't -- I don't feel like -- *I just want to be supervised with my daughter*, to know that I can do this, and *I need to know that my mental health is under control before I try to live on my own*.

*Id*. (emphasis added). Mother conceded that she did not "feel comfortable with [Child] coming anywhere with [her] without . . . being supervised, because of [her] mental health stability." *Id*. at 58. Mother continued:

> I just don't want to -- I would never harm my daughter, if that's what -- where you're going, but *I just still have problems as far as seeing and hearing things that's -- that I'm not okay with*. And, no, it hasn't happened since November, but still, I'd rather be safe than sorry.

*Id*. at 59 (emphasis added).

Following our review, we conclude there was ample basis for the trial court to find that Mother had not stabilized her mental health issues and to reject Mother's claim that a safe reunification with Child was imminent. The trial court's determination that the conditions which led to the Child's removal from Mother's care continued to exist was proper, and we therefore agree that DHS met the second element of section 2511(a)(8).

As to the third element of section 2511(a)(8), which requires a consideration of the child's needs and welfare, there is no dispute that Mother's mental health and substance abuse issues had resulted in incidents that threatened Child's (and Mother's own) safety. Even considering Mother's recent progress after DHS filed the petition for the involuntary termination of her parental rights, her compliance with her mental health and drug and alcohol objectives had been inconsistent. Notably, Mother was unable to progress beyond supervised visits with Child for two hours per week in a controlled setting. Following Mother's hospitalization for burns in November 2021, and missed visitations, Child began acting aggressively after visits with Mother, and was receiving occupational therapy in the foster home. *See* N.T., 4/13/22, at 25, 45, 64. Mr. McNichol testified that although Child was able to recognize Mother, and would call her "Mom," Child remained safe in foster parents' care and had a "definite bond" with them after being in their care for most of her life. *See id*., at 13, 45-46, 61-62. Thus, we conclude that the

- 12 -

record supported the trial court's determination that termination would best serve Child's needs and welfare under section 2511(a)(8).

In sum, we find no abuse of discretion or error of law in the trial court's rulings, and we affirm the trial court's determinations that DHS met its burden of establishing all elements for the involuntary termination of Mother's parental rights pursuant to section 2511(a)(8).[9]

Mother, in her final issue, contests the trial court's determination under section 2511(b), that termination best served the developmental, physical, and emotional needs and welfare of the child. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Our Supreme Court has made clear that section 2511(b) requires the trial court to consider the nature and status of the bond between a parent and child. *See in re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). Existence of a bond does not necessarily result in denial of a termination petition. *See T.S.M.*, 71 A.3d at 267. Instead, the court must examine the effect on the child of severing such bond. *See id*. "When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences." *J.N.M.*, 177 A.3d at 944 (internal citation and quotations omitted).

---

[9] Because we affirm the trial court's determination under section 2511(a)(8), we will not consider Mother's three remaining issues challenging the trial court's rulings under subsections (a)(1), (2), and (5). *See B.L.W.*, 843 A.2d at 384.

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). "[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. (internal citation omitted).

Mother argues that the best interests of Child are not served by terminating her parental rights. *See* Mother's Brief at 18. Mother contends she lived with Child for the first part of Child's life and participated in supervised visits so that she could maintain her bond. *See id*. The trial court found while there was a bond between Mother and Child, it was not a parent-child bond. *See* N.T., 7/6/22, at 94. The court concluded that Child was currently in a loving foster home and that it was in Child's best interests to have permanency. *See id*. at 93-94.

The record supports the trial court's determination. Mr. McNichol testified that while Child recognized Mother as her mother, there was no parent-child relationship between Mother and Child. *See* N.T., 4/13/22, at 46. Mother has attended supervised visits with Child, but her visits have never expanded beyond two hours per week or to unsupervised visits. Mr. McNichol testified that during Mother's visits he observed Child pulling away from

Mother, and Mother having to coax Child to stay with her. *See* N.T., 4/13/22, at 46. Mr. McNichol testified that Child would not experience irreparable harm if Mother's parental rights were terminated because Child has a bond with her foster parents. *See id*. at 47.

Moreover, the record shows that Child has a parent-child bond with her foster mother, who is a pre-adoptive resource. *See id*. at 45-47; *see also T.S.M.*, 71 A.3d at 268 (noting that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents"). Mr. McNichol noted that Child also refers to her foster mother as "Mom," and Child looks to her foster parents when she is sick, hungry, or hurt. N.T., 4/13/22, at 47. Mr. McNichol testified that the foster mother ensures that Child attends her medical appointments, takes Child on trips, enrolled Child in daycare, and financially provides for Child. *See id*. at 47-48. Mother also noted that Child would cry for foster mother during lulls in her visits with Child. *See* N.T., 7/6/22, at 52. Based on this record, we discern no abuse of discretion or error of law by the trial court in terminating Mother's parental rights pursuant to section 2511(b).

Accordingly, we affirm the decree involuntarily terminating Mother's parental rights to Child pursuant to sections 2511(a)(8) and (b). We add that Mother's brief does not challenge the order changing Child's permanency goal to adoption, precluding our review. *See In re M.Z.T.M.W.*, 163 A.3d 462,

465-466 (Pa. Super. 2017) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review). In any event, our affirmance of the involuntary termination decree renders Mother's appeal from the goal change order moot, and we will dismiss the appeal from the goal change order. **See In the Interest of D.R.-W.**, 227 A.3d 905, 917 (Pa. Super. 2020).

Decree affirmed. Appeal from goal change order dismissed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/12/2022

- 16 -